## BERNARD v. FIDELITY UNION CASUALTY CO. (No. 3403.)

Court of Civil Appeals of Texas. Texarkana. June 1, 1927.

Rehearing Denied June 23, 1927.

**1. Evidence ⬅428—One may show that writing apparently binding him was mere colorable transaction, and that real contract was unwritten, and bound another only.**

One may show that writing, binding him on its face, was mere colorable transaction, understood by parties not to be a contract, and that real contract was unwritten, and bound another only.

**2. Insurance ⬅188(2)—Evidence held to show that building contractor signed application for workmen's compensation insurance with understanding that owner should pay premiums.**

In suit against building contractor for premiums on workmen's compensation insurance policies issued to him, evidence *held* to show that defendant signed application as mere formality, with understanding, agreed to by plaintiff's agent, that company for which building was being erected should pay premiums.

**3. Insurance ⬅180—Building contract held sufficient consideration for owner's undertaking to pay premiums on workmen's compensation policies issued to contractor.**

Building contract *held* sufficient consideration for undertaking by company, for which building was erected, to pay premiums on workmen's compensation insurance policies issued to contractor.

**4. Insurance ⬅129—Agent authorized to solicit insurance, negotiate contracts, and agree on amount and times for adjustment of premiums, may contract for payment of premiums by owner on workmen's compensation policies issued to building contractor.**

Agent, authorized to solicit insurance, negotiate contracts, and agree on amount of advance or deposit premiums and periods for adjustment thereof, has authority, binding on principal, to enter into agreement that building owner shall pay premiums for workmen's compensation insurance, issued in name of building contractor.

**5. Insurance ⬅182—Owner's agreement to pay premiums on workmen's compensation policies, issued to building contractor, is not illegal (Workmen's Compensation Law [Rev. St. 1925, art. 8309, § 1]).**

Building owner's agreement to pay premiums on workmen's compensation insurance policies, issued in name of building contractor, is not illegal contract, forbidden by Workmen's Compensation Law (Rev. St. 1925, art. 8309, § 1).

**6. Insurance ⬅182—Building contractor may act as owner's agent in agreeing to pay workmen's compensation insurance premiums.**

Building contractor could act as special agent of owner in matter of agreeing to pay premiums for workmen's compensation insurance, even if liable to third parties as independent contractor for tort.

On Rehearing.

**7. Insurance ⬅182—Building contractor's, owner's, and insurance agent's intention that contractor take workmen's compensation insurance as owner's agent is controlling as between them.**

Intention of building contractor, owner, and insurance agent that contractor should take out workmen's compensation insurance as agent, and for benefit, of owner, is controlling as between parties.

**8. Insurance ⬅182—Superintendent of construction held not independent contractor, but building owner's agent not liable for premiums on workmen's compensation policies issued to him.**

Under contract by warehouse company to pay for all materials and labor and 10 per cent. of cost of construction for services of superintendent of construction, latter was not independent contractor, but agent, and hence not liable for premiums on workmen's compensation policies, issued to him with understanding that warehouse company should pay premiums; contract importing hiring for duration of erection of building, in absence of breach of duty warranting discharge.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action by the Fidelity Union Casualty Company against A. C. Bernard. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

The Fidelity Union Casualty Company, the appellee, brought the suit to recover of appellant the sum of $824.78 alleged to be due and owing by him as premiums on two policies of workmen's compensation insurance issued to him. The appellant denied the allegations of the petition, and specially averred that he signed the application for the insurance only as special agent in behalf of, and for the benefit of, his principal, Kent H. Easter Warehouse Company, with full knowledge and understanding at the time of the appellee's soliciting agent, procuring and taking

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the application for the insurance. It is an admitted fact that the premiums sued for, except $150, are unpaid.

Several assignments of error are submitted, but the controlling one is that "the verdict of the jury and the judgment of the court were contrary to the law and evidence in this: The undisputed evidence showed that, at the time of the execution of the contract sued on, all parties thereto knew and understood that the defendant was signing same merely as the agent for and in behalf of his principal, the warehouse company, and for whom he was in fact the agent in the making of the contract."

It appears that on June 30, 1922, the appellant signed two applications for workmen's compensation insurance for one year. The application on its face recited:

"(1) Name of employer: A. C. Bernard.
"(2) Address of employer: Live Oak and Walker, Houston, Tex.
"(3) The assured is: Individual."

A classified description of the assured's operations was given, and the kind of workmen in the service was designated. The two policies were thereafter issued, and by the terms of each of them the following agreement is shown:

"Fidelity Union Casualty Company does hereby agree with this employer, named and described as such in the declarations forming a part hereof, as respects personal injuries sustained by employees, including death at any time resulting therefrom, as follows:
"One (a) To pay promptly to any person entitled thereto under the Workmen's Compensation Law and in the manner therein provided the entire amount of any sum due, and all installments thereof as they may become due," etc.

The applications were made and signed under the following circumstances: W. H. Brooks, appellee's local agent soliciting insurance, and authorized to take applications for insurance, testified:

"I was out there one day and noticed some building going on. I introduced myself to A. C. Bernard, and told him who I was representing. He informed me that he was building a warehouse for the Kent H. Easter Warehouse Company, and that I would have to see Mr. Easter relative to the insurance, provided any was taken out. So I went to see Mr. Easter, and Mr. Easter said 'Yes,' he realized they needed insurance, and that whatever was satisfactory to Mr. Bernard would be satisfactory to him. Then I went to Mr. Bernard, about 2 or 3 o'clock in the afternoon, and told Mr. Bernard what Mr. Easter had said. Mr. Bernard asked me whether or not he might be liable (for premiums) in the event he signed the application. The best I remember I told Mr. Bernard that he would not be obligated in any way, as he was only (in) the contract for Kent H. Easter Company. It seems to me that statement was before he signed the contract. I talked some 20 or 30 minutes to Mr. Bernard

before he signed the application. He signed the application, and I went out to my car and left. I did try to collect the money upon the policies. Mr. Bernard told me that Mr. Easter would pay them. Then I went to Mr. Easter again, and, as well as I remember, we did get $150 out of it. Mr. Easter said he had put the money to the credit of Mr. Bernard to take care of that obligation."

Mr. Kent H. Easter testified:

"I was president of the Kent H. Easter Warehouse Company in June, 1922. I was constructing a warehouse. Mr. A. C. Bernard was constructing the building for me. * * * I met the agent, Mr. Brooks, that took the application for the insurance for Mr. Bernard. I had a conversation with him with reference to the policies before issued. He approached me soliciting the business. I looked it over and referred him to Mr. Bernard; he having charge of all the bills pertaining to construction. We probably talked 20 or 30 minutes about the advisability of carrying insurance and of our liability in not carrying insurance. I told Mr. Brooks that Mr. Bernard was my agent. * * * The insurance company since the policies were issued has made efforts on several occasions to get notes or money from me as the president of the Kent H. Easter Warehouse Company. They drew up a series of notes, and wanted me to sign them, and I told them I would sign them as soon as I had the authority of the board of directors of the company. I couldn't give them the money because I didn't have it."

The appellant testified:

"I was employed by the Kent Easter Warehouse Company as superintendent of construction. At that time I had men working under me. I signed the application for insurance at the request of the president of the warehouse company. The plaintiff's agent and I were in Mr. Easter's private office, and the question came up as to who was going to sign the application. Mr. Easter wanted me to sign it, and I asked him, 'Why don't you sign for the company?' He said he wanted to keep the record straight for the company. I asked him if I would be responsible for it (premiums), and the agent said I would not, but that he would hold the Kent H. Easter Warehouse Company for the payment of all of the dues. That statement was made before I signed the application. I would not have otherwise signed it if I would be responsible for dues. When that statement was made, then I signed the application. * * * I don't know whether or not the insurance company was paid the dues. I never was consulted about it. I never did receive th policies or a copy from the insurance company."

The warehouse was being built under the agreement as follows: Mr. Kent H. Easter, president of the company, testified:

"Mr. Bernard was constructing the building for me; he was the contractor, constructing the building on a cost plus basis, which means that all material was furnished by the company, and he was paid 10 per cent. as his earning, you might call it. During the course of the con-

struction of the building Mr. Bernard had full charge of the buying and making contracts in connection with it. The Kent Easter Warehouse Company paid the money for the construction of the building. As to the manner in which the money was paid by the warehouse company: The bills were O. K.'d by me, and a company check was issued for the payment of such bills. Some of the bills were paid by money being turned over to Mr. Bernard for such purpose and charged to the building account. The money for the construction was O. K.'d by me and paid out on the different items. Mr. Bernard did not spend any of his own money in the construction of that building. Mr. Bernard was paid a percentage for his services in the construction of the warehouse. Mr. Bernard paid the men who were working under him in currency with the assistance of Mr. Sealy, secretary of the warehouse company. Mr. Sealy was the company bookkeeper as well as auditor. He also had charge of the money that was paid to the laborers in the construction of the building. The warehouse company provided the money for Mr. Bernard to pay the men. * * * Mr. Bernard was to receive 10 per cent. on the cost of constructing the building. He hired the men that worked on the building, and discharged them if not satisfactory to him. The warehouse company had nothing to do with it, only to turn it over to Mr. Bernard and say, 'Here, we want this building up, and we will give you 10 per cent. on the cost.' The warehouse company did not interfere with the work or as to whom he hired and discharged. Mr. Bernard had complete supervision of the work. Nobody of the warehouse company ever suggested to him one single thing about the building. He had the plans, and went according to them in building the warehouse. He was a stockholder in the company, and was doing the work for the warehouse company. * * * I don't think Mr. Bernard reported any of the injured men— there were three of them—as his employees. That was all handled by the secretary of the company; he kept all the blanks in his office. Those men were paid the money as employees on the construction of Easter Warehouse Company."

R. H. Ward, John L. Meany, and Gordon O. McGehee, all of Houston, for appellant.

Collins & Houston, of Dallas, for appellee.

LEVY, J. (after stating the facts as above). [1, 2] The controlling question on the appeal is that of the liability of appellant to pay the premiums for the two policies of compensation insurance. The validity or legal operation of the policies themselves is not involved in the controversy. The appellee contends that there is shown a legal obligation of express or implied agreement on the part of appellant to pay the premiums sued on, for the evidence sufficiently establishes that he made and signed in his own name a written application for the insurance for his own benefit as an employer of labor as an independent contractor constructing the particular warehouse for Kent H. Easter Warehouse Company. The appellant contends that it was ex-

pressly agreed and understood by the parties before and at the time the application was signed for insurance that it should not take effect as a contract binding him personally to pay the premiums. In other words, the appellant insists, in effect, that, although the insurance was to run in his name, and may be legally regarded for his benefit as an employer of labor, yet the real contract as to who was to pay the premiums was an unwritten one, which bound only the Kent H. Easter Warehouse Company, the owner of the building, to pay the same. That is the intendment and legal effect of appellant's pleading. It is elementary that a person may show that a writing which, if real, would bind him upon its face was a mere colorable transaction, and was understood by the parties at the time to be not a contract at all, and that the real contract was not in writing, and bound only another person. So in this case we believe that, if it were true that the application offered in evidence was understood and agreed to be a mere colorable transaction, intended to obscure appellant's real connection with the contract, he would be relieved from liability to pay the premiums. It is believed that the evidence sustains the appellant's contention as the true theory of the case. The evidence was without dispute as to the preliminary negotiations, and final and complete agreement of the parties. The appellee's soliciting agent testified:

"I introduced myself to Mr. Bernard, and told him who I was representing. He informed me that he was building the warehouse for the Kent H. Easter Warehouse Company, and that I would have to see Mr. Easter relative to the insurance, provided there was any taken out. Then I went to see Mr. Easter, and Mr. Easter said, 'Yes,' he realized they needed insurance, and that whatever was satisfactory to Mr. Bernard was satisfactory to him."

The agent then went back to Mr. Bernard, and the following occurred, as testified by the agent:

"Then I went to Mr. Bernard, about 2 or 3 o'clock in the afternoon, and told Mr. Bernard what Mr. Easter had said. Mr. Bernard asked me whether or not he might be liable (for premiums) in the event he signed the application. The best I remember, I told Mr. Bernard he would not be obligated in any way, as he was only (in) the contract for Kent H. Easter Company. I talked some 20 or 30 minutes to Mr. Bernard before he signed the application."

After this conversation, and before the signing of the application, the agent and Mr. Bernard then went together to the private office of the president of the Kent H. Easter Warehouse Company. The following occurred, as testified by appellant:

"The plaintiff's agent and I were in Mr. Easter's private office. The question came up as to who was going to sign the application. Mr. Easter wanted me to sign it. I asked him,

'Why don't you sign for the company?' He said he wanted to keep the records straight for the company. I asked him if I would be responsible for it (premiums), and the agent said I would not, but that he would hold the Kent H. Easter Warehouse Company for the payment of all the dues. When that statement was made, I signed the application. I would not otherwise have signed it if I would be responsible for the dues."

[3-5] The president of the warehouse company admits agreement on behalf of the company to pay the premiums. No intention of the agent to claim premiums from appellant can be inferred in the circumstances. There was a meeting of the minds of all the parties, and they all understood and meant precisely the same thing—that "he (the agent) would hold the Kent H. Easter Warehouse Company for the payment of all the dues," and that appellant "would not be obligated in any way" nor "responsible" for the premiums. His "signing the application" was to be merely formal or colorable. The statement of the agent to appellant was plainly his interpretation and understanding of the agreement as a fact, evidencing his intention in respect thereto, and was not purely an opinion on his part of the legal effect of signing the application. Thus it appears that the appellant did not upon his own initiative and at his own voluntary and independent election take out insurance and agree to pay the premiums. The president of the Kent H. Easter Warehouse Company offered to take out insurance to run in appellant's name and to pay the premiums therefor, and the agent for the company accepted the offer and promise to pay the premiums. The appellant then formally signed the application, with the understanding and agreement that he was not signing the same agreeing thereby to pay the premiums. The building contract was sufficient consideration for the Kent H. Easter Warehouse Company's undertaking to pay the premiums. In fact, it was its own debt. As admittedly shown, the Kent H. Easter Warehouse Company was to pay out of its own money "all the costs of the building," which would include premiums of compensation insurance if taken out, and the appellant was not to advance or spend "any of his own money in the construction of that building." An agent having power to solicit insurance, negotiate contracts, agree on amount "of advance or deposit premium," and agree as to whether "premium is to be adjusted, monthly, quarterly, or semiannually," has authority, binding on the company, to enter into an agreement of the kind here that the owner of the building should pay premiums for compensation insurance issued in the name of the contractor constructing the building. The insurance, running as it did in the name of the contractor as "employer," was in accordance with the terms of article 8309, § 1, of the Workmen's Compensation Law (Rev. St. 1925,

art. 8309). It was not an illegal contract, forbidden by that act, for the owner of the building, instead of the contractor, to agree to pay the premiums for such insurance.

[6] In another view, in the circumstances it would appear that appellant merely signed the application as agent, not intending thereby to bind himself personally for the premiums; his principal being disclosed and the agent of the insurance company having full knowledge and assenting thereto. Assuming the appellant might be held liable as an independent contractor as to third parties for tort (Edmondson v. Coco-Cola Co. [Tex. Civ. App.] 150 S. W. 273), yet as between the owner of the building and himself he could be and act as agent specially in the particular matter of agreeing to pay premiums of insurance.

The judgment is reversed, and, as the record discloses a full development of the case, judgment is here rendered in favor of appellant, with all costs of trial court and of appeal.

### On Rehearing.

[7] The members of this court have reviewed the record in the light of the argument of the attorneys for the parties, and have reached the conclusion, as before, that the appellant cannot be held personally liable for the debt sued upon. The appellant was acting as agent merely, and the liability insurance was arranged for and taken out at the instance and for the benefit of the Easter Warehouse Company, known to the agent of appellee. Such intention of the parties is manifest, and as between themselves is controlling. Therefore the motion for rehearing will be overruled.

[8] As the original opinion is not sufficiently definite, and may be misleading as to the precise point of ruling, we incline to explain and limit the ruling as applicable to the present case. We sustained, as we do now, the assignment of error quoted in the original opinion. The suit was brought for the purpose of charging the appellant for the balance of unpaid premiums on a policy of liability insurance issued by appellee. There was no express agreement to pay premiums. The appellant pleaded and offered evidence for the purpose of showing that he was not personally bound to pay the premiums, and had acted in arranging for liability insurance as agent merely for the Kent H. Easter Warehouse Company, a corporation, who was the principal known to the agent of appellee. The appellee claimed that the appellant was not an agent, and could not be legally held to be an agent, but an independent contractor, and that the indemnity insurance was for his benefit as an independent contractor, and because thereof he was personally liable for the premiums. In our opinion, the evidence established the contention of appellant, and judgment was in this court directed in his

favor. The following inaptly appears in the opinion:

"Assuming the appellant might be held liable as an independent contractor as to third parties for tort (Edmondson v. Coco-Cola Co. [Tex. Civ. App.] 150 S. W. 273)," etc.

It was not intended to hold that appellant was an independent contractor, and that the case referred to was decisive of, or similar to, the present case. The distinction between the two cases is of marked character. In that case Arthur Tufts was to erect the building and to be paid therefor "the total cost of the building, plus 10 per cent." Tufts, and not the owner of the building, was to furnish and to pay out of his own money, in the first instance, for the materials and labor. In the present case the appellant was to be paid for his services as superintendent of the construction "10 per cent." of the cost of construction. He was not to furnish and pay for any materials and labor. The Easter Warehouse Company was to provide and pay, in the first instance, out of its own money, "for all materials and labor." While appellant was given the choice of employees, and given the authority to discharge if not satisfactory to him, as incidental to the duties of superintendent, he was not capable of contracting with reference to the work, except in the capacity of agent. He was not the employer that must indemnify .the injured workman. He had no specific interest in the contract independently of his service. He was to furnish nothing but his services. He incurred no liability for material and wages of the workmen. He had the right to cease his services should he so desire. The contract imports a hiring for the duration of the erection of the building, unless the appellant is guilty of some breach of duty warranting his discharge. Therefore the evidence does not conclusively show, as urged by appellee, that appellant was in the relation of independent contractor, and nowise in the relation of principal and agent, entirely negativing and disproving the defense in the case.